Good morning, Your Honors. May it please the Court. My name is David Berawi. I represent the appellant, James Rutledge. We ask today that you reverse the order adopting the report and recommendation and denying Rutledge's motion to suppress. It's our contention that under an objective analysis of the facts and the law, there was no reasonable suspicion or probable cause to initiate a traffic stop here. There was no perceived violation, nor is there a reasonable conclusion that there may have been a traffic violation. In other words, the traffic stop was illegal and the evidence and statements obtained as a result of that stop should be suppressed as fruits of the poisonous tree. I believe it's most helpful to consider or review the map, the Google map that's in the as well as South Dakota codified law 3229-2.1, which is throughout the record, but addendum 24 has a copy from the district court's ruling. When we look at those two things together, we will show that there is no objective basis to believe that a violation occurred. Now, you argue that the rolling through the second stop doesn't violate the statute. Correct. What's our standard review for that? It's a de novo... Who do we review and by what standard? Sure. We review the district court's ruling and it's a de novo review. However, here... Why is it de novo if the standard is reasonableness for the officer and that's the question for the district court? Are you sure it's de novo? What case would support that? Well, my position would be that the court's interpretation of the statute was incorrect, which then led to a misapplication of the statute. The ultimate conclusion of law is perhaps renewed de novo, but the finding as to whether or not the driver passed through would have to be reviewed for clear error, wouldn't it? Correct. So, the conclusion regarding the view that was available, that is the factual finding that would be under the clearly erroneous standard. Even if... I mean, statutory interpretation is typically de novo, but up or down whether the statute was violated does not answer the question. Correct. Correct. There has to have been an unreasonable objective belief by the officer that the statute wasn't violated and we don't review that. You're right. Correct. That's not a de novo review. Correct. It's our contention that there is no reasonable misunderstanding. Well, I don't know. This signage is actually appropriate under the National Highway Traffic Safety Standards, where they say when you have off-centered intersections, it's not possible to get both stop signs on the right side. You put one on the right, one on the left. The statute kind of says you've got to stop at a stop sign. So, if he rolls through the second stop sign, how is it not a reasonable, at worst, a reasonable misunderstanding of the law on the part of the officer, if it's not a correct understanding? The plain language of the statute is one stop intersection, one stop, not one stop sign, one stop. In addition, the National Traffic Safety Administration information is not in the record. However, it's not reasonable to conclude a misunderstanding of the statute here. We also have the sheriff from the area who says people drive through that second one all the time, essentially coming through Trooper Doutling's testimony. It wouldn't be reasonable to conclude under South Dakota law and under that provision that you have to stop at every stop sign. However, the district court did not engage with that question, but instead turned to the view available from the first stop sign. That was the basis on which the district court found that it was reasonable for Trooper Doutling or any reasonable officer to conclude that a violation had occurred. That conclusion says Trooper Doutling had an objectively reasonable basis for concluding that Rutledge did not have a view of traffic approaching from the northwest when he stopped at the first stop sign. I believe that's clearly erroneous and objectively so. When you look at that map and hypothetically, if a car stops at that first stop sign, it could also take a right-hand turn, which is greater than 90 degrees at this diagonal intersection. And in order to accomplish that maneuver, the full beyond 90 degree turn, they would have to have a view of oncoming traffic from the northwest from the first stop sign. Therefore, logically... You're just re-arguing facts. A fact argument you lost in the district court. Well, clearly erroneous in this context. Good grief. How are we supposed to do that? Well, by reviewing this map and the logical conclusions that should be drawn. It would not be logical to conclude... But the map doesn't show us elevations. It doesn't show us really the lay of the land. And the photographs are not particularly helpful. The judge hears all the testimony. Clearly erroneous is a high burden to get across. I don't think it's likely that your arguments can be very successful if you just say, look at the diagram or look at the map. I think there's got to be more to it than that. We have to be left with a sense that a clear error has been made. Well, in addition, the video that the district court and the magistrate reviewed had obstructions that are not typically there and were not there. So the court's review of that video that cannot zoom in like the human eye does. The camper is in the way. Any conclusion drawn from that evidence... I didn't argue that. I say you. I don't know if you would trial counsel. That wasn't pointed out to the district court? I believe it was. The court didn't see a need to wait to take another video? No, another video was not taken. The court took your argument into account based on the testimony and its view of the video. And it was clear error to reject your interpretation of the map and your criticism of the video. Yes. Okay, we get it. Moreover, it was nighttime. Any vehicle stopped at the first stop sign would have a clear view of oncoming headlights as well. The videos, the evidence didn't show that. Which would be visible for miles. This is a flat area. And from the videos, you can see that. This is the plains of South Dakota. It's essentially a flat area. Moreover, we see that again in the trooper's video. You can see winter in the far distance. You can see for miles and miles. Subsequent to the reporting, there were several inconsistencies in the trooper's statements. There is evidence that the trooper Dowling, who observed the supposed violation, reported that the car turned west. He also, apparently, also reported that the car turned east, according to the recording of Sergeant Lord. Given this information, his view was obstructed. Admittedly, his observations were not necessarily what actually transpired. Given the context of this... It's the test. No. The test is his objective reasonableness. Right. And objectively, from his vantage point, we do not believe that he could reach that conclusion. Moreover, the subsequent stop was unnecessarily prolonged by what appeared on the video to be Sergeant Lord dragging his feet, taking his time, prolonging the... Your brief on that completely ignores the dog alert in arguing no probable cause. We're talking about the time prior to the dog alert. Well, you ask us to address this off-topic questioning. We've addressed that in countless cases. What are we supposed to do? Overrule a prior... I know I've written once or twice about this kind of routine questioning in the context of a traffic stop, which is not always about, well, what about your tail light and so forth and so on. Sure. What are we... Is this an in-bank... Are you preserving this in-bank or is there something I'm missing? What this is discussing is that in Rodriguez, the discussion is that they cannot prolong the ticketing activity in order to accomplish the dog sniff. So it's clear error that didn't prolong? Correct. Correct. Given what we see on the video, if you watch the trooper's actions, he's prolonging and waiting for his accompanying officers to come. And obviously there is... That's a rather substantial line of cases that talk about you can't just slow walk the stop in order to get the dog there. But there's some things that are being developed here according to the findings that have been made that I think we need to consider. And that is that the occupants appeared to be nervous, that they appeared to be tired, that there was a mini-torch that was observed, all of which are kind of sort of building towards probable cause. So there's something more than just the sort of innocuous conversation about, you know, other background stuff. Where are you going? What are you doing? That kind of stuff. And it seems to me that the government's going to at least argue that probable cause is developing. And that means that the extension at any point, given the short nature of it in its entirety, that it was reasonable. So why isn't it reasonable? Well, here the observations of the officer were essentially innocuous. People were nervous. They did not perceive that they had committed any traffic violation and yet they're being pulled over. They stopped at the stop sign. These sorts of things. A person's going to be upset. And you see that in the video. He says, you know, I don't mean to be rude, but that's not what happened. I stopped. And at that time Trooper Lord misunderstood what had actually transpired. In addition, it's 4.50 in the morning, 5 in the morning. You're going to be tired when you have been driving all night in the dark. Finally, the torch. That is not necessarily indicative. As the trooper said, people have these. They have common uses. It doesn't necessarily indicate it. It's not reasonable or probable cause at that point. As the trooper testified, he didn't have probable cause until the dog sniffed. And so he was waiting until that developed, which is why. This was testimony to cross-exam at the hearing? Yes. Was he asked for probable cause or reasonable suspicion? Probable cause. Probable cause. Not reasonable suspicion. Correct. They had a lot of suspicion before the car reached the intersection. The court, I believe, magistrate, judge, asked these questions. And I see that my time is waning. We would also ask that due to the fruit-of-the-poisonous-tree doctrine... I'm fond of my observation that there was a lot of suspicion before the car ever got there. That was separate from the stop. That they had information. They had no particular... We're talking about prolonging. And Judge Erickson is talking about the things other than just writing a ticket that, among other reasons, may have justified waiting for other officers to arrive. And the officers said that they had no particular information that this was a drug run. There were other mitigating facts that the phone jumped from South Dakota to Colorado. They had no specific information that they knew anything suspicious was going on. They had information from a confidential informant that was confirmed, at least in part, by the car arriving at the intersection. They had no specific information that that day that there was going to be any transportation. Investigations are built piece by piece. And the cumulative knowledge is all relevant, right? You don't challenge that, I take it? Cumulative knowledge. The Court's observation about cumulative knowledge. No, we don't challenge that on appeal. And we ask that we reserve our remaining time. Thank you. Mr. Colaner. May it please the Court, Mr. Brary. My name is Kevin Colaner. I'm with the U.S. Attorney's Office in South Dakota, representing the government here. We are asking that the order denying the suppression motion be affirmed in all respects. Your Honor, there was substantial testimony from the officer who saw the rolling stop or the lack of stop at the second stop sign. He explained his vantage point. Within the government's brief we've put in, I think it's government's Exhibit 3, in that picture itself there's a little blue box with an X on it and he shows where he was parked. And I think that's important because it really explains kind of his vantage point and why he could see both of these stop signs but perhaps not where the driver turned. You know, much is made in the briefing that the officer made a mistake about the direction that this driver went after the stop signs, but it does kind of make sense when you see the vantage point with respect to the farm equipment and so forth. The South Dakota traffic law, the stop sign place of stopping law issue, no one disputes here is ambiguous on its terms. What it says is essentially you have to stop at a stop sign. It tells you where near a stop sign you have to stop. I would note that in the brief the phrase that the appellant uses is stop signage, which to me indicates multiple signs. The statute itself says stop sign and I think that's significant because especially when we're talking about whether it was objectively unreasonable for the officer to believe that there was a violation here, I think it's a fair reading for an officer on the job to read this and think you've got to stop at a stop sign. The other thing here is these stop signs, and it's not quite clear from some of the vantage points and some of the exhibits, they're 120 feet apart. There's a video that was submitted in a supplement by the defense after the hearing that shows rolling up to these signs and you can see very clearly there is a fair distance between. The first stop sign comes before this kind of turn out dirt area where one would be turning right if coming from the south. Where is it in relation to the blue X? So the blue X is over and are you seeing it, Your Honor? That's just before this turn out. Where is the stop sign? The first stop sign is before that turn out heading so the bottom of the page is south, top north. And so the officer is there positioned there to the west, I'm sorry, to the east of the intersection. So what I'm getting at is it's also a fair reading that there's sort of two intersections here. There's first the stop sign that indicates where someone turning to the right needs to stop before heading into that turn out. And then there's also the stop sign where someone heading to the left or heading north intersects with the highway itself. I just note that because when I look at this I think that's the reason those signs were placed there that they wanted someone to stop before starting into that turn out area. Everyone also agrees that this is a confusing configuration of stop signs and I think what we mean by that is it's not the norm. That doesn't mean that the statute itself is ambiguous. I think it's just as applied to this situation. It at least creates some confusion about where you would need to stop. And the question for the court is whether it's unreasonable, objectively, for this officer to believe that there should have been two stops here. Credibility questions of the officer, whether a stop actually happened, the court's virtually unreviewable on appeal. There's some argument made in the briefing that there was all sorts of pressures put to bear under the circumstances on this officer. There was testimony about that from several directions, both from his supervisor, from the officer himself. Both of those officers confirming no, there was no pressure. If there hadn't been a traffic stop, reasonable suspicion for a traffic stop, no stop would have happened that night. Mr. Rutledge would have went on his way and all the officers would have gone home. So there really is no evidence that there was a motive to fabricate here or any sort of reason that this officer was pressured to lie. So next question is about the stop. Doesn't Wren take care of any issue there? Yes. People keep refighting Wren, but it continues to be the law of the land. Right, right. You know, and yeah. And Hine, I mean, officers aren't required to be perfect also. They're required to be reasonable. So now, you know, as Rutledge proceeds north, there's been a mistake that's made. The officer tells the other folks on dispatch he went one direction, he ended up going north. Well, when you read the testimony, they've got officers stationed, one off in the direction that they were told he was heading, and then one up to the north. So the officer to the north says, well, he's not coming my way, he starts heading south. Then he learns from the other officer, I'm not seeing him coming my way, and that's Sergeant Lord. Is this anything other than a part of the credibility question? No, it's not, Your Honor. So Officer Lord sees, you know, passes by a white van and figures, well, if he's not going the direction he thought he was going, that must have been the white van that I passed. It's all perfectly reasonable under the circumstances, 4.30 in the morning, rural South Dakota roads, not seeing any other cars, that Sergeant Lord knew that this was the right vehicle to stop, and that's why the stop took place, you know, all alone. Now we get to the stop itself. Was it unreasonable in length? Was it unreasonably prolonged? The testimony of Sergeant Lord confirmed... Ten minutes till the dog arrived, right? Right, roughly eight minutes after Mr. Rutledge. Was the dog in a car that was part of the team that was conducting the overall, what was going on? Yeah, spread out about... But, you know, within a 15-mile radius or so, the number of six different officers. I don't think I've ever had a... Since the Supreme Court taught us what you can't delay for a dog, I don't think I've ever seen a delay as short as ten minutes. Well, and of course, arguing cases dealing with stops in rural South Dakota, this is rare for me too, in the sense that, you know, we're often up here talking about sometimes hours, you know, that it took to get an officer on scene. But eight minutes after he's in the car, the dog is sniffing on the back of this van. The testimony from Sergeant Lord is that he was still in the midst of completing the warning ticket process. He hadn't finished the process, and he explains why that is. You know, one would think, well, that should be pretty quick to complete the process. Well, he gets a driver's license. The driver's license matches up to South Dakota Records that has an address, and he confirms a different address. So he even testifies, well, I had to go in and I had to update the address information. That's why he's capping away on his laptop. He then has to put in the vehicle information. He has to put in the VIN, he says. It's a Florida rental car, so that takes some time. There's conversation between the two, you know, of course, where are you going, what are you doing stuff, but there's also conversation initiated by Mr. Rutledge. At one point, he says, you know, aren't you the officer that stopped me once before? They have a back and forth about that. A few questions asked, eight minutes, there's the time. So there really isn't any evidence here for the court to find that this was an unreasonably prolonged stop before the dog sniff happened. If the court finds that, then we get into the question of whether there were probable cause facts sufficient to extend the stop. The government isn't contending that any of these facts in isolation would lead to probable cause. There's a red, you know, mini-torch. The officer testifies, you know, he's been an officer doing drug interdiction cases for 20 some years, and he said, you know, it's a red mini-torch, it's different than a regular lighter, not the sort of thing, for instance, I'm paraphrasing his testimony, he didn't say this exactly,  It's a torch. He says, you know, when I see that, it's usually drugs. There's evasiveness in the answers. Passenger gave a false name and birth date. He said that Rutledge went from being tired to being on heightened alert once the canine was mentioned. And the other part, and I think this goes to Your Honor's question, Judge Loken, about the probable cause that was developing, is he also testified he knew about the background of the drug investigation? And each of these facts are confirming things, are corroborating things from that investigation. Use of a rental car, going on these long drives from Colorado to South Dakota in the middle of the night. I agree with opposing counsel that 4.50 a.m., if you pull someone over, they might be tired, if they've been driving all night. But why are you driving all night, right, in a rental car in rural South Dakota, going on this route that is the very sort of route that one would expect if he was doing the very sort of things that the drug investigation led the officers to believe he would be doing? There are certainly legitimate reasons for people to be driving overnight. Absolutely. And it's the same with the mini-torch. The fact of the matter is that cigar aficionados use mini-torches all the time because it's hard to get an even flame to a cigar, right? No question, Your Honor, no question that each of these things in isolation we in the brief said, look, the passenger and the driver gave different answers to where they were heading. I dropped a footnote in the brief explaining, look, we're not claiming that that's so wildly out of line. One said Lower Brule, one said Chamberlain, they're about 25 miles apart, fair responses. But all these facts taken together along with the information about the developing drug investigation led to additional probable cause at that point, at least reasonable suspicion leading to probable cause at that point. So for those reasons, we don't believe that there was any violations here, and because of that, there was no poisonous tree from which fruit could grow for the Miranda argument here. I have about three minutes left on the clock. If the court has any questions, I'm happy to answer them. Otherwise, I'll take my chair. Thank you, Your Honor. Thank you. I'd just like to touch on a few points. The statute itself is not ambiguous. This is not like Hyen where there was another statute that created confusion. This is one stop at the stop intersection explicitly by the language. In addition, the first stop sign has flashing lights on it, which you can see in the videos provided by the government. The second one does not. At night, that is the most illuminated stop sign that is demanding a stop. At night, it's unreasonable to conclude that a person who stops at the flashing stop sign then proceeds slowly through the intersection and so on has violated the law. That's an unreasonable conclusion. Also, the passenger driver distinctions, Sergeant Lord didn't have that information at the operative time. And I see my time has expired. Thank you. Thank you.